UNITED STATED DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

INEZ TILLMAN, *Pro Se*          :
24808 Canoe Drive             :
Macomb, Michigan 48042     :
Plaintiff,                  :

                       :   **Case No.**
       **vs.**            :   **Jury Trial Requested**
                       :

Denis R. McDonough,      :
Secretary of Veteran Affairs   :
U.S. Department of Veteran Affairs :
810 Vermont Avenue        :
Washington, DC 20420      :
Defendant.              :



## COMPLAINT

*Pro Se* Plaintiff Inez Tillman complains of Defendant Department of Veteran Affairs as follows:

### INTRODUCTION

1. This is a civil rights complaint for retaliation against Plaintiff by her supervisor due to Plaintiff's engagement in protected opposition to unlawful discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq*. ("Title VII").

2. From May 30, 2016, until January 31, 2023, Plaintiff Inez Tillman (an African American woman) worked in the New York Harbor Healthcare System's Opiate Replacement Treatment Program (ORTP) under the supervision of Dr. Brian Sands (a white male.)

3. During the time that Plaintiff worked in ORTP she witnessed and was subjected to unlawful discriminatory practices that she opposed and complained about to Dr. Sands in verbal and written communications.

4. When Plaintiff engaged in protected activity by persistently and in good faith expressing opposition directly to Dr. Sands about these unlawful discriminatory practices, he retaliated against her by giving her a performance evaluation rating that was lower than Plaintiff deserved, and which even he admitted was a lower rating than Plaintiff deserved.

## JURISDICTION AND VENUE

5. This Court has jurisdiction of Plaintiff's federal claims pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq*. ("Title VII").

6. Venue is proper in that all of the events, actions, and conduct alleged in this complaint occurred between 2016 and 2023 at the Department of Veteran Affairs New York Harbor Health Care System which is within this District.

## PARTIES

7. The pro se Plaintiff, Inez Tillman, is an adult person who currently resides in the state of Michigan. From 1993 up until January 2023 Plaintiff was residing and working in the state of New York.

8. Defendant Denis McDonough is the secretary of the Department of Veteran Affairs whose office is located at 810 Vermont Avenue in Washington, DC.

9. The Department of Veteran Affairs qualifies as an employer under Title VII of the Civil Rights Act of 1964.

2

## PROCEDURAL BACKGROUND

10. Plaintiff initiated contact with the Office of Resolution Management, Diversity & Inclusion (ORMDI) on November 2, 2021, following her receipt of a performance evaluation on October 21, 2021, in which her supervisor rated her work lower than she deserved.

11. On January 21, 2022, ORMDI emailed Plaintiff a *Notice of Right to File a Discrimination Complaint*.

12. On February 4, 2022, Plaintiff filed a formal complaint of discrimination.

13. Plaintiff has exhausted her administrative remedies at the U.S. Equal Employment Opportunity Commission.

14. The U.S. Equal Employment Opportunity Commission issued Plaintiff a Final Order which included a Right to File Civil Action. A true and correct copy of the *Final Order and Right to File Civil Action* is attached as **Exhibit A**.

15. This Complaint is being filed within 90 days of Plaintiff's receipt of the *Final Order and Right to File Civil Action* dated September 20, 2023.

## ALLEGATIONS OF FACT

16. On May 30, 2016, Plaintiff began working at the New York Harbor Healthcare System and was assigned to the ORTP.

17. Dr. Brian Sands was the Section Chief for Substance Use Disorder (SUD) Recovery Services and was Plaintiff's supervisor in ORTP.

18. Plaintiff was the only African American clinician assigned a caseload to provide substance abuse treatment to veterans enrolled in ORTP. All other clinicians assigned

3

caseloads to provide substance abuse treatment to veterans enrolled in ORTP were white individuals. We all worked under Dr. Sands' supervision.

19. Over the course of her employment in ORTP Plaintiff: (1) engaged in protected activity by opposing unlawful employment practices that she believed, in good faith, were violations of anti-discrimination laws, (2) had reason to believe that Dr. Sands knew about her protected activity as she made her opposition known by expressing such directly to Dr. Sands in verbal and written communications, (3) was subjected to a retaliatory action that was materially adverse and (4) there was a causal connection between the protected activity and the materially adverse action.

20. As a VA employee, Plaintiff was required to participate in mandatory annual training and education sessions on employment discrimination, cultural awareness, diversity, equity, and inclusion (DEI), harassment, whistleblower activity, etc. Plaintiff learned that if an employee experiences or witnesses violations of anti-discrimination laws or other unfair workplace practices, it is the employee's duty to report such to a supervisor or other management official.

21. Over the course of her employment, Plaintiff experienced and/or witnessed numerous employment practices that she believed were violations of discrimination laws. Based on good faith belief that violations were occurring, Plaintiff opposed and complained to Dr. Sands about what she experienced and witnessed. Plaintiff's opposition and complaints included, but are not limited to, the following:

(a) A situation occurred early on in Plaintiff's employment where Dr. Sands called Plaintiff into his office and told her that he had received a phone call from an African

4

American female psychiatrist who had been working in the Emergency Department the night before. Dr. Sands was the on-call psychiatrist and the person that an on-duty psychiatrist should report to in the event of a crisis. Dr. Sands said to Plaintiff that the psychiatrist called him because a white veteran in the ED used a racial slur against her.

*Plaintiff engaged in protected activity by expressing opposition to disparate treatment based on race in that:* During this meeting that Dr. Sands called Plaintiff into (he did not call any of the white employees into the meeting) he shared the incident described above and then started questioning Plaintiff about her racial beliefs and experiences with racism in the VA. This made Plaintiff feel uncomfortable as she did not know what Dr. Sands wanted her to say or how anything she said might negatively impact her working relationship with him. Consequently, Plaintiff expressed to Dr. Sands during the meeting that she did not feel comfortable discussing racial matters with him. Plaintiff believed, in good faith, that Dr. Sands' questioning of her about her racial beliefs and experience was disparate treatment based on her race, as he did not call white employees into his office to discuss the situation that occurred in the ER and to question them about their racial beliefs and experiences in the VA. Plaintiff told Dr. Sands that she felt that his questioning of her about her racial beliefs and experiences but not doing so with the white employees made her feel that she was being treated differently by him.

(b) On or around 2017 one of Plaintiff's white coworkers, Lisa Szymanowicz, (hereinafter referred to as LS) stated in a staff meeting that one of the veterans showed his "black ass" off in the clinic. The people who were present in the meeting were: Plaintiff, Plaintiff's white coworkers, Dr. Sands, and an African American female

psychiatrist who was doing a psychiatry rotation in the clinic. LS made the comment several times in the meeting and Dr. Sands never said a word to her about her offensive comments.

*Plaintiff engaged in protected activity by expressing opposition to a person in ORTP being referred to in offensive and derogatory terms on the basis of race in that:* After the meeting the African American psychiatrist reported to Dr. Sands that she was offended by LS's comments in the meeting. The next day Plaintiff reported to Dr. Sands that she, too, felt that LS's comments were racist and offensive just as the African American psychiatrist had said to him the day before. Plaintiff expressed, in good faith, her opposition to what occurred in the meeting by telling Dr. Sands that, as the leader of the clinic, his silence while a white person made inappropriate and derogatory comments about an African American person was creating a hostile work environment.

(c) On or around 2018 there was a staff meeting in which a white female coworker, Nona Lynch (hereinafter referred to as NL) mentioned that an African American veteran on her caseload referred to her as a "slut" and to Dr. Sands as a "fat slob." LS spoke up and said that NL is not a slut but that there were other females who worked in the clinic and were not present in the meeting that she would consider to be sluts. The only females who worked in the clinic and were not present in the meeting (as they did not attend these meetings) were a medical support assistant and a nursing assistant, both of whom are African American women. Dr. Sands also spoke up in the meeting and said that he did not care about the veteran referring to him as a "fat slob" but that NL was not a slut, and that the veteran should not have referred to her as such.

6

He did not say anything about, or in defense of, the un-present females (both African American) that LS referred to as sluts.

***Plaintiff engaged in protected activity by expressing opposition to women in ORTP being referred to in offensive and derogatory terms on the basis of race in that:*** The day following the meeting Plaintiff went to Dr. Sands' office and told him that LS's comments were offensive to her as she is a member of the same protected class that LS was denigrating. Plaintiff expressed to Dr. Sands that LS has the right to say whatever she wants to say, but that his defending a white woman against such name-calling while remaining silent when African American women are called the same derogatory name was discriminatory and revealed disparate treatment. Plaintiff also stated to Dr. Sands that allowing a white female to make such comments about black women was creating a hostile work environment.

(d) On or around November 16, 2020, Plaintiff received a phone call from a white male coworker, Robert Ness, (hereinafter referred to as RN) in which he asked Plaintiff if she would be willing to work a late shift on that day and the next day because two coworkers were going to be absent. Plaintiff spoke with Dr. Sands about this on the same day because RN is not Plaintiff's supervisor and had no right to ask Plaintiff to work any additional hours. Dr. Sands agreed to meet with RN and Plaintiff in the ORTP group room to discuss this matter. During the discussion, RN became irate and started yelling in Plaintiff's face, "calm down." His voice was very loud and people outside of the closed group room (a medical support assistant and a security officer) reported that they could hear RN yelling at Plaintiff. Throughout this encounter Dr. Sands never said a word to RN

7

about how he was addressing Plaintiff. He simply stood by while RN continued verbally abusing Plaintiff.

***Plaintiff engaged in protected activity by expressing opposition to verbal abuse by a white male based on her race in that:*** Immediately after the meeting Plaintiff went to Dr. Sands' office and told him that she felt that RN's behavior was racist and it made Plaintiff feel that as a white male, RN, seemed entitled to speak to an African American woman in such a manner. Plaintiff told Dr. Sands that she felt embarrassed, humiliated, and intimidated by RN. Plaintiff also told Dr. Sands that she felt that his standing by and witnessing the incident without intervening or stopping RN made her feel that he did so because she is an African American woman and both he and RN are white males. Dr. Sands did not do anything about Plaintiff's concerns causing Plaintiff to write an informal complaint (**Exhibit B**) against RN pursuant to VA Handbook 5021, Part IV, Chapter 2, Section 6. Dr. Sands received a copy of the email that Plaintiff wrote to RN as he was cc'd on it, and he clearly saw that Plaintiff was complaining about RN's behavior which she felt was racially motivated.

(e) On or around July 7, 2020, Dr. Sands called Plaintiff into his office and informed her of an email that was written by a white female coworker, Emily Horowitz, (hereinafter referred to as EH) and that was sent to his (Dr. Sands') supervisor. EH did not cc the email to Dr. Sands or to Plaintiff. Dr. Sands' supervisor forwarded the email to him. The gist of the email (as Dr. Sands read parts of it to Plaintiff) was a litany of complaints that EH had about how Dr. Sands was performing his job in ORTP and her overall dissatisfaction with his management of the clinic. With regards to Plaintiff, EH

8

mentioned in the email (according to what Dr. Sands shared with Plaintiff) that Dr. Sands should require Plaintiff to work within the ORTP clinic instead of the office that Plaintiff was currently occupying and had been assigned to by Karen Roe, the administrative officer whose duty it was to make office assignments. Dr. Sands told Plaintiff to work in the group room in ORTP after receiving the email that EH wrote.

***Plaintiff engaged in protected activity by expressing opposition to being reassigned to unreasonable workspace based on her race in that:*** Plaintiff objected to being reassigned to the group room and voiced her opposition to Dr. Sands during the meeting in his office on that day. Plaintiff told Dr. Sands that she felt she, as an African American woman, was being treated differently than white coworkers as he did not tell any white coworker to leave their assigned offices and work in the group room or any other unreasonable workspace. Even after Plaintiff told Dr. Sands that white coworkers were not being reassigned, he still told Plaintiff to work in the group room. Plaintiff complained to Dr. Sands that EH's telling him to change her workspace from office to group room was not her right as she was not the one who had the authority to delegate workspace, and that her actions suggested a sense of entitlement and white privilege. Plaintiff also questioned Dr. Sands as to why he brought the email to her attention (as EH had not addressed or cc'd the email to Plaintiff) except for the fact that he was going to acquiesce to EH's demand, while ignoring Plaintiff's concerns, thereby treating EH and Plaintiff differently.

9

(f) Plaintiff's tour of duty was 7:30am to 4:00pm, Monday through Friday. EH had the same tour of duty. LS worked from 8:15am to 4:45pm Monday through Friday. Plaintiff complained to Dr. Sands from the start of her employment that EH and LS were not working their TOD, but instead would routinely report to work around 9:00 am.

*Plaintiff engaged in protected activity by (i) expressing opposition to disparate treatment based on race and (ii) engaging in protected whistleblower activity in that:* Plaintiff complained and expressed her opposition to Dr. Sands on numerous occasions about white coworkers not being required to work their full TOD but being paid for a full TOD whereas she, an African American woman, had to work her full TOD and that this was disparate treatment based on race. Dr. Sands ignored Plaintiff's complaint and her expressed opposition to disparate treatment based on her race. Dr. Sands was aware of Plaintiff's complaint as he acknowledged in his EEOC affidavit (**Exhibit C** – EEOC ROI at p. 111[1]) that Plaintiff made such complaints of disparate treatment based on her race. Further, Plaintiff's complaint to Dr. Sands about white coworkers' fraud and improprieties constituted a whistleblower disclosure and Dr. Sands did nothing about Plaintiff's whistleblower disclosure.

(g) Around February 2020 Plaintiff posted artwork and posters in the ORTP clinic in recognition of Black History Month. A white coworker, Joan Kendrew (hereinafter referred to as JK) objected to the artwork and posters being hung in the clinic claiming that they were attached with tape and that this posed a health hazard in the clinic.

---

[1] The entire EEOC Report of Investigation consists of 1,788 pages and is password protected. Exhibit C is page 111 in the ROI which is available in EEOC public portal as Case Number 520-202368x.

Without saying anything to Plaintiff, JK removed the artwork from where Plaintiff had posted it. When Plaintiff told JK that she did not have the right to do so, another coworker, NL, called Dr. Sands who was in another office that he occupied outside of the ORTP clinic (that office was located on the 17th floor in the hospital) and told him to come and talk with Plaintiff about this matter.

*Plaintiff engaged in protected activity by expressing opposition to disparate treatment based on race in that:* Dr. Sands came to Plaintiff's office (as NL told him to do) and told Plaintiff that hanging the artwork with tape created a hazard as JK said. Plaintiff told Dr. Sands that every year since she started working in the clinic EH (a white female coworker) hung Hannukah decorations with tape in the clinic and that he never told her that it created a hazard and had to be removed, nor was it ever removed. Plaintiff told Dr. Sands that he was using a double standard in terms of what decorations could be hung in the clinic. Plaintiff further tried to explain to Dr. Sands the importance of featuring artwork and other symbols that reflect one's culture (the ORTP veterans in treatment were predominantly African American and Latinx) as the substance abuse literature and research shows that when clients feel welcomed and included it leads to more positive treatment outcomes. Dr. Sands ignored Plaintiff's complaint and her expressed opposition to his disparate treatment of Plaintiff.

22. In May 2020 a white female coworker (NL) retired from ORTP creating a vacant Health Science Specialist position.

23. Around October 2020 Dr. Sands interviewed a white male, Jonathan Kessler, (hereinafter referred to as Kessler) for the position during a staff meeting that was attended by

11

Plaintiff, Plaintiff's white coworkers, Dr. Sands and a white female psychiatrist who was doing a psychiatry rotation in ORTP. During the interview, Kessler stated that he had no substance abuse treatment experience, knowledge, or skills. Dr. Sands was aware of and acknowledged Kessler's lack of qualifications for the position.

24. Dr. Sands also interviewed a person of color (an African American female) who met all of the qualifications for the Health Science Specialist position.

25. Dr. Sands hired Kessler for the position, and Kessler started working in ORTP around January 2021.

26. ***Plaintiff engaged in protected activity by expressing opposition to discriminatory hiring practices committed by Dr. Sands against a member of a protected class in that:*** The day after the interview with Kessler in October 2020 Plaintiff went to Dr. Sands' office to ask him a question regarding one of the veterans on her caseload. As Plaintiff was leaving, Dr. Sands stopped Plaintiff and asked her what she thought of Kessler from the interview that had been held the day before. Plaintiff told Dr. Sands that she knew Kessler as they had both worked at Chapel Street Clinic (a VA community-based clinic) in the past and that as Kessler stated in the job interview, he did not have substance experience (a prerequisite for working in ORTP as outlined in the ORTP Policy and Procedures Manual with which Dr. Sands was conversant and which he had updated on March 15, 2019.)

27. Plaintiff respectfully expressed opposition to the hiring of Kessler (and felt she had the right to do so as she was responding to a question that Dr. Sands had posed to her) and questioned Dr. Sands as to why he would hire an unqualified white male over a highly

qualified African America woman. Dr. Sands said that he was going to hire Kessler, nonetheless. Dr. Sands also told Plaintiff that she should help Kessler learn about the tasks that we were required to perform in ORTP and seemed to become angry with Plaintiff when she stated to him that this was an unlawful and discriminatory hiring practice.

28. Plaintiff felt that she had a right to give her honest opinion as Dr. Sands posed the question to her regarding Kessler's hiring. Plaintiff felt uncomfortable and anxious after this encounter because she felt that Dr. Sands did not like the answer she gave to his question and was fearful that he might retaliate against her in some way.

29. Dr. Sands is required to complete an annual performance evaluation of Plaintiff. On October 20, 2021, Plaintiff submitted a self-assessment for the evaluation period October 1, 2020, to September 30, 2021, (Exhibit D) to Dr. Sands in which she expressed in writing her continuing opposition to the climate that existed in ORTP that seemed to favor white individuals over POC such as Plaintiff. Plaintiff expressed this opposition based on what she had experienced and witnessed in ORTP (including but not limited to the events previously outlined in this complaint) that Dr. Sands knew of, participated in, and/or did nothing about.

30. The next day on October 21, 2021, Dr. Sands called Plaintiff into his office to discuss her performance evaluation for the evaluation period October 1, 2020, to September 30, 2021 (Exhibit E) and told her that he was rating her "fully successful" even though Plaintiff had met and surpassed all of the proficiency requirements, something that Dr.

13

Sands did not dispute. Dr. Sands stated to Plaintiff in the meeting that her work deserved an excellent or outstanding rating.

31. *Plaintiff engaged in protected activity by expressing opposition to retaliation for complaining about racism, discrimination, and disparate treatment based on race in that:* Plaintiff told Dr. Sands that she felt he was retaliating against her because of the complaints she had been making over the years and the comments that she wrote in her self-assessment. Dr. Sands was aware of Plaintiff's complaints about discrimination and retaliation as he stated in his EEOC affidavit (**Exhibit F** – EEOC ROI at p. 97).

32. Dr. Sands badgered and harassed Plaintiff when she met with him on October 21, 2021, for her performance review by referring to her as "angry and hostile."

33. *Plaintiff engaged in protected activity by expressing opposition to being called "angry and hostile" on the basis of race in that:* Plaintiff told Dr. Sands that referring to her as "angry and hostile" was a racial stereotype often used against African American women when they speak out against perceived racism and that she felt that he was using the term that context in reference to her. Plaintiff told Dr. Sands that his name calling was inappropriate in the evaluation meeting and that she felt it was an attempt to threaten and intimidate her because of her complaints and opposition to discrimination and disparate treatment.

34. Dr. Sands further badgered and harassed Plaintiff in the meeting by stating to her "you think I'm a racist."

35. *Plaintiff engaged in protected activity by expressing opposition to Dr. Sands' trying to attribute thoughts to her that she did not make regarding racism in that:* During the

14

meeting Plaintiff told Dr. Sands that she never called him a racist, but that the complaints she made over the years and the comments she wrote in her self-assessment were for the purpose of making it known to him how such activity impacted her as the only African American clinician in ORTP with hope that this would lead to fair, equitable, and non-discriminatory treatment of Plaintiff equal to that which white individuals seemed to experience in ORTP. Plaintiff also told Dr. Sands that she felt his comment was an attempt to threaten, intimidate and retaliate against her for opposing discrimination and disparate treatment.

36. Plaintiff and Dr. Sands agreed to an EEOC mediation session on January 12, 2022. In the mediation session Dr. Sands volunteered information stating that he gave Kessler an outstanding evaluation for the October 1, 2020, to September 30, 2021, evaluation period even though Kessler was not performing the clinical work that was required for such a high rating because he did not have the skills and experience to do the work.

37. *Plaintiff engaged in protected activity by expressing opposition to disparate treatment based on her race in that:* During the mediation session on January 12, 2022, Plaintiff expressed opposition to the disparate treatment by telling Dr. Sands that she, an African American woman, was given a lower rating than she deserved and Kessler was given a higher rating than he deserved due to the race of the two of them. Plaintiff made this statement in good faith as she questioned Dr. Sands about what Kessler had done to earn such a high rating and Dr. Sands did not identify any work that Kessler had done that would have resulted in an outstanding rating by an objective person. Plaintiff, on the

15

other hand, had done work which Dr. sands was aware of that surpassed a fully successful rating.

38. During the mediation session on January 12, 2022, Plaintiff asked Dr. Sands to reconsider his evaluation of her work and rate her according to what she had accomplished which included not only meeting the proficiency standards but going above and beyond the performance standards with special projects and activities which she performed for the benefit of the veterans and the ORTP clinic. When Dr. Sands staunchly stated in the medication session on January 12, 2022, that he refused to change Plaintiff's performance evaluation rating, Plaintiff continued to express opposition and told Dr. Sands that she believed that he was taking this position because among all of the other complaints of disparate treatment, she also voiced opposition to the hiring of Kessler (specifically stating that he hired an unqualified white male over a highly qualified African American female) which she felt was a discriminatory hiring act.

39. In a written communication to Plaintiff (**Exhibit G**) in October 2022 (a full year after giving Plaintiff a fully successful rating in October 2021) Dr. Sands admitted that he violated VA policy in his rating of Plaintiff and that he should have rated her excellent in October 2021. Dr. Sands made this admission to Plaintiff on October 13, 2022, which was a day before he submitted his sworn affidavit to the EEOC on October 14, 2022.

40. Throughout the time that Plaintiff worked in ORTP she confided in two psychologists who worked in the VA about her experiences of disparate treatment and retaliation and how this affected her mental and emotional well-being, how such treatment caused her anxiety and stress, how such treatment caused her physical pain due to unreasonable

16

workspace, and how such treatment diminished Plaintiff's enjoyment of life. Plaintiff also phoned one of the psychologists immediately after the evaluation performance meeting on October 21, 2021, and told her about the extreme distress she had experienced as a result of the session with Dr. Sands and about Dr. Sands' hurtful comments to Plaintiff by calling her "angry and hostile" and making the comment, "you think I'm a racist" to Plaintiff.

## COUNT I

### Title VII – Retaliation on the Basis of Race

41. Plaintiff realleges the foregoing paragraphs as though fully set forth herein.

42. Plaintiff is a member of a protected class on the basis of race. She is an African American woman.

43. Plaintiff, in all respects, not only met, but exceeded all of the proficiency standards required in her job.

44. The Department of Veteran Affairs retaliated against Plaintiff for engaging in protected activity when she expressed opposition to numerous instances of racism, discrimination, and disparate treatment as described in this complaint while working under the supervision of Dr. Brian Sands in the New York Harbor Health Care System by rating her lower on a performance evaluation than she deserved. Dr. Sands admitted that he violated VA policy in rating Plaintiff lower than he should have, but the timing of this admission, the context in which it was made, and the facts and circumstances surrounding which it was made suggests that true reason for the low rating was, indeed, retaliation for engaging in protected activity.

17

45. The Department of Veteran Affairs' actions, as perpetrated by Dr. Brian Sands, were taken with willful and wanton disregard of Plaintiff's rights under Title VII.

46. As a direct and proximate result of said unlawful employment practices and in disregard of Plaintiff's rights and sensibilities, Plaintiff suffered humiliation, degradation, emotional stress, physical pain and other compensatory and consequential damages.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Inez Tillman prays that this Court:

A.  Enter judgement in favor Plaintiff and against Defendant for violations of Plaintiff's rights under Title VII;

B.  Declare that the actions of the Defendant constituted unlawful retaliation such that it be known to all future African American employees in ORTP that discrimination and disparate treatment will not be tolerated, nor will such employees be retaliated against for opposing such treatment;

C.  Declare that the Defendant failed to take proper action with regards to whistleblower disclosure made by Plaintiff to Dr. Sands and Dr. Sands be held accountable for failure to take the proper action regarding fraud and improprieties;

D.  Award Plaintiff compensatory damages in such amount that will reasonably compensate her for money, benefits, opportunities, etc. that Plaintiff might have been entitled to were it not for the performance rating Dr. Sands gave her, and for emotional distress, and for anxiety and stress, and for physical pain, and for lack of enjoyment of life;

E.  Award Plaintiff punitive damages in such amount as the Court deems proper;

F.  Award Plaintiff her costs, attorney fees, and non-taxable expenses that have been

    expended since the initiation of this action;

G.  Grant Plaintiff such other and further relief as the Court deems equitable and just.

### JURY TRIAL REQUESTED

Plaintiff Inez Tillman hereby requests a jury decision on all issues in this action.

Dated: November 25, 2023                          Respectfully submitted,

                                                  _____
                                                  Inez Tillman, Plaintiff *pro se*
                                                  24080 Canoe Drive
                                                  Macomb, MI 48042
                                                  347 713-2118
                                                  zeniti@aol.com

19

Exhibit A

## DEPARTMENT OF VETERANS AFFAIRS
## OFFICE OF EMPLOYMENT DISCRIMINATION COMPLAINT ADJUDICATION
## WASHINGTON, D.C. 20420

## TRANSMITTAL OF FINAL ORDER

TO:      The Parties
         Representatives of the Parties (if applicable)
         ORMDI Field Office
         EEOC Administrative Judge

SUBJ:    Final Order

|  |  |
|---|---|
| Complainant's Name: | Inez Tillman |
| Agency Case No.: | 200H-630-2022-142474 |
| EEOC Case No.: | 520-2023-00068X |

Enclosed is the Department's Final Order concerning the above-referenced complaint(s) of employment discrimination.

The Final Order includes a statement explaining the complainant's right of appeal and right to file a civil action.

The transmittal to the complainant and, if applicable, the complainant's representative, includes EEOC Form 573 (MSPB Form 185, if the subject complaint is a "mixed case") for use should the complainant wish to appeal the enclosed Final Order.

If the complainant requested a hearing before an EEOC administrative judge, the transmittal to the ORMDI field office also encloses the hearing record, including the EEOC administrative judge's decision, and/or other miscellaneous correspondence/documents provided to this office by the judge.

Enclosure(s)

**DEPARTMENT OF VETERANS AFFAIRS**
**OFFICE OF EMPLOYMENT DISCRIMINATION COMPLAINT ADJUDICATION**
**WASHINGTON, D.C. 20420**

| | |
|---|---|
| Inez Tillman,<br><br>              *Complainant,*<br><br>          *v.*<br>Secretary,<br>Department of Veterans Affairs,<br><br>          *Agency.* | VA Case No. 200H-630-2022-142474<br><br>EEOC Case No. 520-2023-00068X |

## FINAL ORDER

It is the final action of this Department in the above-referenced matter to accept and fully implement the attached decision of the EEOC administrative judge.

If dissatisfied with this final action, the Complainant may appeal or file a civil action as set forth below.

### RIGHT OF APPEAL

Complainant may appeal this final decision or order within 30 calendar days of receipt to: **Equal Employment Opportunity Commission, Office of Federal Operations (EEOC- OFO)**. The appeal may be filed via the EEOC's Public Portal, U.S. Mail, or Hand-Delivery.

1. **EEOC-OFO recommends that all submissions and communications from complainants be electronic.**

   a. **Appeals submitted electronically should be completed via the EEOC Public Portal at** https://publicportal.eeoc.gov/Portal/Login.aspx. See warning below and detailed instructions attached.

### WARNING!

Attorneys and non-legal representatives MUST <u>NOT</u> use the EEOC Public Portal to file appeals on behalf of their clients as the portal will incorrectly list the representative as the complainant. Therefore, COMPLAINANTS MUST file electronic appeals themselves through the EEOC Public Portal regardless of whether they are represented.

1

b. Appeals submitted by mail should be completed by using EEOC Form 573. A copy of EEOC Form 573 is attached.  Appeals submitted by mail should be sent to:

>Director
>U.S. Equal Employment Opportunity Commission
>Office of Federal Operations
>P.O. Box 77960
>Washington, D.C. 20013

c. As an alternative to mailing the appeal, the appeal may be hand-delivered to:

>Equal Employment Opportunity Commission
>Office of Federal Operations
>131 M Street N.E., Suite 5SW12G
>Washington, D.C. 20507-0004

2. If mailing or hand-delivering the appeal to the EEOC-OFO, a copy of the appeal must also be sent to the VA Office of General Counsel at the following address:

>Department of Veterans Affairs
>Office of the General Counsel (024)
>810 Vermont Ave., N.W.
>Washington, DC 20420

3. Statements or briefs in support of the appeal must be submitted to the EEOC-OFO within 30 calendar days of the filing of the appeal.  The EEOC-OFO will accept statements or briefs in support of an appeal by facsimile transmittal at (202) 663-7022.  If statements or briefs are submitted by mail or hand delivery, a copy of any such statement or brief, including any statements made on EEOC's "Appellant Docketing Statement," must also be sent to the VA's Office of General Counsel at the above address.

4. If an appeal is filed with the EEOC-OFO by mail or hand delivery, the appeal, and any subsequently filed statement or brief, must contain a statement certifying the date and method by which copies of these documents were served on the VA's Office of General Counsel.

5. If Complainant files an appeal with the EEOC-OFO beyond the above-noted time limit, Complainant should provide the EEOC-OFO with an explanation as to why the appeal should be accepted despite its untimeliness.  If Complainant cannot explain why timeliness should be excused, the EEOC-OFO may dismiss the appeal as untimely.

2

## RIGHT TO FILE A CIVIL ACTION

Complainant also has the right to file a civil action in an appropriate United States District Court. Complainant may file a civil action as follows:

(1) within 90 days of receipt of this final decision if no appeal to the EEOC-OFO has been filed; OR

(2) within 90 days after receipt of the EEOC-OFO's final decision on appeal; OR

(3) after 180 days from the date of filing an appeal with the EEOC-OFO if there has been no final decision by the Commission.

Complainant must name the official head of the Department of Veterans Affairs, **Denis McDonough**, as the Defendant. Complainant may not name just the Department. Complainant must also state the official title of the Department head, which is the **Secretary of Veterans Affairs**. Failure to provide the name or official title of the head of the Department may result in dismissal of the case. **Please consult your District Court's website for procedures to file a civil action and any COVID-19-related changes in procedures.**

If Complainant decides to file a civil action under Title VII (discrimination due to race, color, religion, sex, national origin, or reprisal) or under the Rehabilitation Act of 1973, as amended, (discrimination due to disability), and if Complainant does not have or cannot afford the services of an attorney, Complainant may request that the Court appoint an attorney to represent Complainant and that the Court permit Complainant to file the action without payment of fees, costs, or other security. **The grant or denial of the request is within the sole discretion of the Court.** Filing a request for an attorney does not extend the time in which to file a civil action. Both the request and the civil action **MUST BE FILED WITHIN NINETY (90) CALENDAR DAYS** of the date Complainant receives the final decision from the Department or the Commission.

MARY LYNNE POPIDEN
Digitally signed by
MARY LYNNE POPIDEN
Date: 2023.09.20
09:54:41 -04'00'

9/20/2023

MARY LYNNE POPIDEN
Director,
Office of Employment Discrimination
Complaint Adjudication

Date

Enclosures:  EEOC Public Portal Instructions
EEOC Form 573

3

## DEPARTMENT OF VETERANS AFFAIRS
## OFFICE OF EMPLOYMENT DISCRIMINATION COMPLAINT ADJUDICATION
## WASHINGTON, D.C. 20420

### CERTIFICATION OF SERVICE

Complainant's Name:    Inez Tillman
Agency Case No.:       200H-630-2022-142474
EEOC Case No.:         520-2023-00068X

I certify that on this date, the foregoing Final Order was sent via electronic mail to the individuals and parties shown below. For timeliness purposes, it shall be presumed that the parties received the foregoing Final Order within five (5) calendar days after the date it was sent via electronic mail.

Complainant

Inez Tillman

zeniti@aol.com

Complainant's Representatives

Michael C. Fallings

mfallings@fedattorney.com

Nora Ezzat Cozzillio

ncozzillio@fedattorney.com

Agency's Representative

Shani Walker

Shani.Walker1@va.gov

Administrative Judge

Neile F. Eisner

neile.eisner@eeoc.gov

<u>EEO Manager</u>

Marcia Gordon

<u>marcia.gordon@va.gov</u>

<u>ORMDI Regional Office (08E)</u>

<u>ORMNEOAdministrativeGroup@va.gov</u>

MARCELLA CALLENDER

Digitally signed by MARCELLA CALLENDER
Date: 2023.09.20 09:59:03 -04'00'

9/20/2023

_____
(Signature of Dispatcher)

_____
(Date of Dispatch)

Exhibit B

# Tillman, Inez

| | |
|---|---|
| **From:** | Tillman, Inez |
| **Sent:** | Monday, November 16, 2020 7:39 AM |
| **To:** | Ness, Robert |
| **Cc:** | Sands, Brian |
| **Subject:** | Incident on November 12, 2020 |

I am writing to you regarding the very disturbing incident that occurred in the clinic on Thursday, November 12.

While I was in my office checking my voicemail, I received a call from you in which you stated that Lisa would be out of the office today (Thursday, Nov 12) and tomorrow (Friday, Nov 13). You asked me if I would be willing to work until 4:45 pm on those days. I was aware that Lisa would be on AL for those 2 days, but I was baffled as to why you were asking me if I would be willing to work to 4:45 pm. I stated to you that my shift is 7:30 am to 4:00 pm. I also asked you what this was all about and whether Dr. Sands had asked you to speak with me. I then told you that I would be returning to the clinic and I would speak to Dr. Sands. I immediately came back to the clinic and spoke with Dr. Sands and told him that you had asked me if I would be willing to work to 4:45 pm on Thursday and Friday and that I did not know why you were asking me this. Dr. Sands said he did not know where this was coming from either. I then said to Dr. Sands that we needed to talk with you about this.

You, Dr. Sands, and I met in the group room to discuss your asking me if I would be willing to work until 4:45 pm on Thursday and Friday. As I was trying to speak you said to me in a loud and condescending tone "calm down." As I continued trying to speak you then yelled at me in an even louder and booming voice, "calm down." I am highly offended by your behavior toward me yesterday as I felt it to be racist, sexist, and totally inappropriate.

You have no right to call me to inquire as to whether I am willing to work any hours. You are not in a position of authority or supervision over me; I am not your subordinate. Further, you have no right to do what I felt was an attempt to intimidate, embarrass, and create a hostile work environment for me. Others in the clinic heard you yelling at me and commented to me about it. I am asking Dr. Sands to speak with those in the clinic who heard you outside of this closed group room and they will affirm that the only voice that they heard was yours. I need to know from Dr. Sands what action will be taken to assure me that your behavior is not condoned and that this type of behavior will not happen again.

Whether you choose to take any action to remedy this situation is up to you. Please be informed, however, that I reserve my right to file a formal complaint against you so that I will not be subjected to this type of behavior again.

1

Exhibit C

What she said was very similar to what she had said over a year ago (except more specific). In both, the core communication was that IT was very punctual about her hours and the other not as much. I believe that this comment formed the nidus or what eventually became her claim that I allowed White and non-black counselors to work fewer hours than they were supposed to (for the same pay) while she, as a counselor who was black or non-white, had to cover the patients who needed help in the absence of their primary counselor. This is one of the accepted claims used to support the allegation of disparate treatment, and ultimately, a hostile work environment. That time, I asked the others about their hours and felt there wasn't evidence to support time and attendance violations. I had (have) no doubt that I did not specifically allow one group to not work while ordering another group (of 1) to work longer hours and cover, but I wondered if I had, fact, gone far enough investigating her allegations last year.

Consequently, I asked the Administrator / MH for advice on how to go about an investigation of time and attendance issues that balanced IT's accusation with the rights of the others. She directed me to a centralized VISN level consultation program and on 10/11/2022, I spoke with a Labor Relations consultant about how to investigate time and attendance. I asked a few other questions and learned that on two issues, I had erred in IT's 2021 evaluation. The most relevant way was that I had used IT's refusal to follow s supervisory directive in my assessment of her competency and the second (and less relevant) was that a Self-Evaluation was only required in ECF evaluations. After confirming this, I took steps to try to rectify my errors, including notifying Dr. Tillman on 10/13/2022.

For reference, here is the complainants' allegations, verbatim from the Statement of Claim Basis.
Complainant was discriminated against based on race (Black) and Reprisal when, from August 2020 to October 21st, 2022, she was subjected to a hostile work environment when Dr. Brian Sanders (BS), Section Chief, Substance Abuse:
a) ignored complainant's complaints of disparate treatment.
b) allowed white employees to work less than a full workday from 9:00am to 4:00pm, and get paid for a full day, whereas complainant worked from 7:30am to 4:00 p.m., which caused complainant to cover the patients for the white employees when they should have been on the job.
c) agreed to give complainant a performance rating higher than "fully satisfactory" only if complainant agreed to have meetings with the Clinical Coordinator, Jonathan Kessler (JK), but none of the white colleague's performance evaluations were based upon having meetings with JK
d) told complainant, her work was "excellent", but instead issued complainant a "Fully Satisfactory" after complainant put her concerns of discriminatory practices in her self-assessment
e) said to complainant "you think I'm a racist" during a meeting to discuss complainant's performance evaluation
f) refused to answer complainant, after complainant ask why she was being treated differently
g) used different criteria for evaluating complainant and complainant's white counterparts.
h) gave JK duties and responsibilities that were not within his job title, which placed demands on complainant

And the following independently actionable claims:

Exhibit D

**Self-Assessment 2021**

**Element # 1**

**Name of Element: Technical Competence (Critical)**

> **Standard #1 Name of Standard: Performance of Clinical Duties**
>
> **Employee Justification for Standard #1:**

Over this past evaluation period I have fulfilled all of my clinical duties by performing the following tasks:

- Accepting consults and referrals from VA employees and non-VA agencies/programs seeking assistance with referring veteran for enrollment in ORTP. Consulting with VA employees and non-VA agencies/programs regarding current ORTP enrollment/admission status for vets seeking treatment

- Performing substance abuse evaluations on veterans seeking enrollment in ORTP, as needed

- Performing psychosocial assessment on my caseload of 32-36 veterans at regularly scheduled intervals

- Writing treatment plans on veterans on my caseload at regularly scheduled times

- Performing BAM-R assessments on veterans on my caseload on a monthly basis

- Writing monthly progress notes on veterans on my caseload

- Conducting substance abuse groups for veterans struggling with achieving abstinence from use of illicit substances

- Holding 1:1 counseling sessions with veterans on my caseload to provide support for their individual problems pertaining to substance abuse

> **Standard #2 Name of Standard: Consulting and Coordinating Care with Other Clinicians**
>
> **Employee Justification for Standard #2:**

Over this past evaluation period I have consulted and coordinated veterans care in the following manners:

- Communicating and coordinating with other clinicians in ED and inpt units when veterans on my caseload have required inpatient psych admissions

- Communicating and coordinating with other clinicians in SAR programs, non-VA hospitals, shelters, courts, etc. when veterans on my caseload have been placed or involved with such treatment/placement

**Element # 2**

**Name of Element: Customer Service (Critical)**

> **Standard #1 Name of Standard: Assisting Veterans with Ancillary Needs**

> **Employee Justification for Standard #1:**

Over this past evaluation period I have assisted veterans with obtaining allied and ancillary services to supplement their substance abuse treatment in the following ways:

- Working with veterans to help them become involved and enrolled in caregiver program

- Working with veterans to help them obtain therapy dogs to supplement their mental health treatment

- Referring veterans to local free and low-cost gyms to help them with their recreational needs

- Assisted veterans by referring them to online religious/spiritual programs during this period of covid to help with their spiritual growth and development

> **Standard #2 Name of Standard:  Assisting Veterans and Staff with Allied Therapeutic Needs During Period of Covid and Social and Racial Injustices:**

> **Employee Justification for Standard #2**

Over this past evaluation period I have developed programs to assist veterans, as well as staff who are dealing with the impact of covid and social and racial injustices by:

- Putting together a therapeutic gardening group for veterans and staff aimed toward healing and self-soothing the negative impact of covid and racial and social injustices as it disproportionately impacted people of color

- Put together a Black History Month Program to help build self-esteem and pride among African American veterans that consisted of video recording of African American achievements, postings and artwork throughout the clinic highlighting African American achievements

- Recognized Hispanic Heritage Month with postings and artwork throughout the clinic bringing attention to the accomplishments and achievements of the Latinx community

## Element # 3

### Name of Element: Individual Work Productivity (Critical)

#### Standard #1 Name of Standard: Attendance and Punctuality

#### Employee Justification for Standard #1:

Over this past evaluation period I have engaged in productive work by:

- Reporting to work onsite on a daily basis during my regularly scheduled TOD (7:30 am to 4:00)

- Changed my TOD form 8 am arrival time to 7:30 am arrive time in order to accommodate veterans in the clinic who arrive early for medication

#### Standard #2 Name of Standard: Working at Full Capacity

#### Employee Justification for Standard #2:

Over this past evaluation period I have engaged in productive work by:

- Maintaining a full caseload of clients

- Willingly accepting and taking on new clients being admitted to the clinic

## Element # 4

### Name of Element: Education and Training (Non-Critical)

#### Standard #1 Name of Standard: Participation in VA Mandatory Trainings

#### Employee Justification for Standard #1:

Over this past evaluation period I have participated in the following VA-sponsored trainings:

- All required TMS trainings as scheduled

- CM coaching sessions

#### Standard #2 Name of Standard: Participation in SUD-specific Trainings

#### Employee Justification for Standard #2:

Over this past evaluation period I have participated in the following SUD-related trainings:

- Minimal Services Methadone Maintenance Treatment (from Seattle VA)

- Cultural Competence and Integrated Care for Substance Use Disorders (from CESEATE)

- Made a presentation to NY Harbor Health Care System Diversity Advisory Council on Racism and SUD Treatment

- Made a PowerPoint presentation to NY Harbor Health Care System substance abuse treatment directors on racism and SUD treatment

- Participated in weekly zoom sessions with colleagues in SARP and ptsd on issue of racism in SUD treatment

- Participated in several session by NYS Harm Reduction Association on race and SUD treatment

## Optional – Employee Comments

### Describe the goals you had set out to accomplish this time period:

One of my goals during this time period was to focus more attention on the role that race plays in substance abuse treatment services that are offered in the NY Harbor.

### Which goals did you accomplish?

I feel that I made some progress toward achieving this goal by writing a paper outlining some of the problems and presenting a PowerPoint presentation on this topic. I feel that I at least raised my voice and let it be known that this is an area of concern for me.

### Which goals did you not accomplish and why not?

My goal was to develop an antiracism framework for substance abuse treatment in ORTP. This goal was not achieved. There is an absolute lack of awareness and sensitivity to racial factors in treatment of POC in this clinic and that is appalling given the fact that 75% of the clinic (according to data I analyzed from avatar) are POC. Not only that, the individual, structural, and organizational racism in this clinic that favors and enables white supremacy and condones white privilege of white employees is detrimental to a POC such as myself when trying to bring about the antiracism work that I feel in important and needed.

### Which other objectives did you meet, beyond your stated goals?

Despite the racist mentality that operates within ORTP, I was able to work with other clinician in the mental hygiene clinic to brainstorm some changes that, with administration approval, we are going to work on implementing. These include such things as looking at drop out and retention rates among POC in SUD treatment, analyzing BAM-R data to determine what domains, if any, are racially sensitive, looking at structural barriers to treatment, developing racially sensitive assessments, etc.

### What achievements are you most proud of?

I am most proud of the work on antiracism SUD treatment that has been done thus far.

Exhibit E

| VA Department of Veterans Affairs | PERFORMANCE APPRAISAL |
|---|---|

This form is to be used for Title 5/Hybrid Title 38 employees. Instructions for completing this form may be found at http://vaww.va.gov/OHRM/EmployeeRelations/ under the Performance tab. For additional information, see VA Handbook 5013, Part 1. If additional space is needed for any item on this form, use page 6, Section I, or attachment pages.

### SECTION A: PERFORMANCE PLAN AND APPRAISAL OF

| EMPLOYEE'S NAME (Last, First, Middle Initial) | POSITION TITLE, SERIES AND NUMBER | PAY PLAN-GRADE |
|---|---|---|
| Tillman, Inez | Addiction Therapist, GS-101 | GS-11 |

| DEPARTMENT/OFFICE | SERVICE | LOCATION (City, State) |
|---|---|---|
| NYHHS | Mental Health Service | New York, NY |

| DATE ASSIGNED PRESENT POSITION | PERIOD COVERED BY THIS PERFORMANCE PLAN |
|---|---|
| 10/99 (MM DD YYYY) | FROM 10/01/2020 (MM DD YYYY)   TO 09/30/2021 (MM DD YYYY) |

| SIGNATURE AND TITLE OF RATER PREPARING THIS PERFORMANCE PLAN | DATE (MM DD YYYY) | SIGNATURE OF EMPLOYEE | DATE (MM/DD-YYYY) |
|---|---|---|---|
| Brian Sands, MD  Section Chief / Sub Abuse Svcs | 11/30/2020 | *[signature]* | 11/30/20 |

### SECTION B: PERFORMANCE PLAN

*Each performance plan must include all elements that will be used to assign an overall rating. Performance plans must contain at least one critical and one noncritical element. Each critical and noncritical element usually contains three to five performance standards. See VA Handbook 5013 Part 1 for additional guidance regarding mandatory performance standards, and planning performance plans. Critical elements will be denoted by an asterisk (*).*

PERFORMANCE ELEMENTS/PERFORMANCE STANDARDS
PERFORMANCE ELEMENTS/STANDARDS
**Clinical Support:**

**1.    Documentation (20% of Element):**

*\*Fully Successful:* Completes psychosocial assessments/reassessments, psychosocial treatment planning, progress notes and relevant encounter and/or event capture information in a timely manner, per service, program and medical center policy.

*\*Exceptional: In addition to meeting requirements for fully successful performance, demonstrates at least one contribution to documentation design, tracking, use of documentation in a manner that enhances patient care or contributes to compliance with measures.*

**2.    Assessment, Treatment Planning, and Care (30% of Element):**

*\*Fully Successful:* Provides assessment, treatment planning and on-going care that is substantial, relevant, well-conceptualized, and responsive to client's input and needs.

*\*Exceptional: In addition to meeting requirements for fully successful performance, demonstrates at least (one) patient intervention that reflected unusually skilled and caring work resulting in a positive outcome for client.*

**3.    Clinical Collaboration and Planning (30% of Element):**

*\*Fully Successful:* Demonstrates effective skills and professionalism in planning and collaborating with patient, family, providers, and agencies, and shows a sound use of resources to enhance continuity of care.

*\*Exceptional: In addition to meeting requirements for fully successful performance, demonstrates at least (one) intervention that reflected unusually skilled and caring planning and collaboration resulting in positive outcome for client*

VA FORM
OCT 2015 **0750**

## SECTION B: PERFORMANCE PLAN (Continued)

PERFORMANCE ELEMENTS/PERFORMANCE STANDARDS

### 4. Patient/Family Education (20% of Element):

*Fully Successful:* Provides skilled patient/family education that is consistently clear, well-conceptualized, understandable, and includes follow-up to assess outcome when relevant.

*Exceptional: In addition to meeting requirements for fully successful performance, demonstrates at least (one) episode of patient/family education that reflected unusually skilled and caring presentation and outcome assessment resulting in positive benefit for client.*

## Administrative Support:

### 1. Interdisciplinary Collaboration (40% of Element):

*Fully Successful:* Demonstrates effective, flexible, cooperative and responsible interdisciplinary collaboration, both within Medical Center and external agencies/providers.

*Exceptional: In addition to meeting requirements for fully successful performance, demonstrates at least one collaboration that reflected unusually skilled or caring efforts to accomplish a positive outcome for client.*

### 2. Productivity and Productivity Reporting (40% of Element):

*Fully Successful:* Maintains appropriate level of productivity and all productivity reporting in accordance with program and profession-specific guidelines, as well as actively participating in quality management activities.

*Exceptional: In addition to meeting requirements for fully successful performance, demonstrates proactive efforts to maximize productivity by improving/enhancing access to care, developing programming to encourage patient participation, or provides additional coverage for units above and beyond original assignment.*

### 3. Use of Supervision (20% of Element):

*Fully Successful:* Utilizes professional supervision appropriately to address clinical, systems, and administrative issues, as well as to enhance professional awareness and professional development.

*Exceptional: In addition to meeting requirements for fully successful performance, demonstrates at least one instance of unusually skilled engagement of supervision to problem solve an issue or proactively enhance professional awareness/development.*

## Other Administrative Program Support:

### 1. Professional Development (50% of Element):

*Fully Successful:* Reflects voluntary initiative to further professional development through training initiatives and attendance at relevant meetings, seminars, and conferences, or serve as a graduate social work field instructor.

*Exceptional: In addition to meeting requirements for fully successful performance, demonstrates at least one instance of proactive initiative to engage professional development above the routine duties of assignment, such as successful completion of advanced training or successful service as a graduate social work field instructor.   XXX*

### 2. Participation in Meetings, Committees and Other Assignments (50% of Element):

*Fully Successful:* Participates effectively and consistently in service meetings, committees and/or special assignments within discipline, program. medical center, and/or community.

*Exceptional: In addition to meeting requirements for fully successful performance, consistently demonstrates active and effective participation or special contribution to process of meetings, committees, or special assignments.*

## SECTION B:  PERFORMANCE PLAN *(Continued)*

PERFORMANCE ELEMENTS/PERFORMANCE STANDARDS

**Customer Service:**

Relationships with supervisors, co-workers and others within the organization must be consistently courteous and cooperative in nature and overall contribute to the effective operation of the office. Performance must demonstrate the ability to adjust to change or work pressure in a pleasant manner; handle differences of opinion in a businesslike fashion; follow instructions conscientiously; and function as a team member, helping the group effort where possible.

Interacts with a wide variety of staff and demonstrates sensitivity to and an understanding of their needs by taking ownership of the problem and adopting the customer's needs as their own. Provides professional and technical advice, support and assistance to all customers with a view towards accomplishing the service mission (i.e., customer service). Personal interactions will be free of legitimate negative feedback. Customers are treated in a professional manner, with tact, courtesy and respect. Instills confidence and trust with supervisors, peers and subordinates by providing timely and quality service. Meets established time frames and deadlines in area of responsibility.

*Fully Successful: Demonstrates facility requirements for courteous and professional engagement of staff and customers.*

*Exceptional: In addition to meeting requirements for fully successful performance, demonstrates 100% compliance with of maintaining highest level of courtesy and professionalism without any reported instances of legitimate negative feedback in relationship to staff and customers.*

## SECTION C:  CHANGES TO PERFORMANCE PLAN *(Changes may be recorded anytime during the rating period.)*

ELEMENT TITLE

PERFORMANCE STANDARD(S)

ELEMENT TITLE

PERFORMANCE STANDARD(S)

| SIGNATURE OF RATER | DATE *(MM DD YYYY)* | SIGNATURE OF EMPLOYEE | DATE *(MM-DD-YYYY)* |
|---|---|---|---|
| | | | |

## SECTION D:  PROGRESS REVIEW

At least one progress review is required during the appraisal period.  The employee must be informed of his/her progress as measured against the performance plan. Additional progress reviews may be documented on page 6, Section 1.

A progress review was conducted and discussed with the employee, and the employee's performance as of this date:

☒  Is considered Fully Successful or better.

☐  Needs improvement to be Fully Successful or better.  *(See VA Handbook 5013, Part I, for additional information regarding addressing unacceptable performance.)*

| SIGNATURE OF RATER | DATE *(MM DD YYYY)* | SIGNATURE OF EMPLOYEE | DATE *(MM DD YYYY)* |
|---|---|---|---|
| *[signature]* | 11-7-2021 | | |

VA FORM 0750, OCT 2015

*Employee refused to sign progress review*

## SECTION E:  ACTUAL ACHIEVEMENT

List each ELEMENT from Section B of the employee's performance plan where indicated below, and indicate the overall level of achievement that best describes the employee's performance for each element.  Do not indicate achievement for each individual performance standard. Justification, including specific examples of performance for each element that was rated Exceptional or Unacceptable, must be provided in the space below.  Rating an element Exceptional means that Fully Successful performance standards have been significantly surpassed for ALL standards within that particular element.  This level is reserved for employees whose performance in the element far exceeds normal expectations, and results in major contributions to the accomplishment of organizational goals.

Prior to assigning an Unacceptable level of achievement, ensure applicable policy requirements have been met as required in VA Handbook 5013, Part I.

| ELEMENTS<br>*(Use the same Elements as listed in Section B)* | LEVELS OF ACHIEVEMENT | | |
| --- | --- | --- | --- |
| | EXCEPTIONAL | FULLY SUCCESSFUL | UNACCEPTABLE *(See instructions above)* |
| Clinical Support  (Critical) | ☐ | ☑ | ☐ |
| Program Support  (Critical) | ☐ | ☑ | ☐ |
| Other Administrative Program Support  (Non Critical) | ☐ | ☑ | ☐ |
| Customer Service  (Critical) | ☐ | ☑ | ☐ |
| | ☐ | ☐ | ☐ |
| | ☐ | ☐ | ☐ |
| | ☐ | ☐ | ☐ |
| | ☐ | ☐ | ☐ |
| | ☐ | ☐ | ☐ |
| | ☐ | ☐ | ☐ |
| | ☐ | ☐ | ☐ |

Use this section to provide justification, including specific examples of performance, for each element that was rated Exceptional or Unacceptable. (Specific achievements at the Fully Successful level are optional.)

JUSTIFICATION:

## SECTION F: OVERALL RATING

**TYPE OF RATING**

☒ ANNUAL RATING OF RECORD    ☐ SPECIAL RATING OF RECORD

☐ SUMMARY RATING (POSITION CHANGES - EMPLOYEE OR RATER)

PERIOD COVERED BY THIS APPRAISAL *(Complete only for Special Rating of Record or Summary Rating.)*

FROM  10/01/2020 *(MM DD YYYY)*    TO    09/30/2021 *(MM DD YYYY)*

**NOTE: Recommended Performance Rating** - Using achievement levels assigned in Section E and the criteria described below, check the appropriate rating.

**PERFORMANCE RATING**

☐ **OUTSTANDING** - Achievement levels for all elements are designated as Exceptional.

☐ **EXCELLENT** - Achievement levels for all critical elements are designated as Exceptional. Achievement levels for noncritical elements are designated as at least Fully Successful. Some, but not all, noncritical elements may be designated as Exceptional.

☒ **FULLY SUCCESSFUL** - The achievement level for at least one critical element is designated as Fully Successful. Achievement levels for other critical and noncritical elements are designated as at least Fully Successful or higher.

☐ **MINIMALLY SATISFACTORY** - Achievement levels for all critical elements are designated as at least Fully Successful. However, the achievement level(s) for one (or more) noncritical element(s) is (are) designated as Unacceptable.

☐ **UNACCEPTABLE** - The achievement level(s) for one (or more) critical element(s) is (are) designated as Unacceptable.

SIGNATURE AND TITLE OF RATER    *Brian J Sw*    DATE *(MM DD YYYY)* 10-21-2021

## SECTION G: HIGHER LEVEL REVIEW/APPROVAL

Required only for Minimally Satisfactory and Unacceptable ratings of record; unless organization has chosen to have higher level approval required for Outstanding ratings of record.

☐ Concur with recommended rating.

☐ Do not concur with rating. Approve rating of _____

EXPLANATION FOR PERFORMANCE RATING CHANGE

SIGNATURE AND TITLE OF APPROVAL OFFICIAL    DATE *(MM DD YYYY)*

## SECTION H: EMPLOYEE RECEIPT OF PERFORMANCE APPRAISAL

A copy of this performance appraisal was given to me. ▶    SIGNATURE OF EMPLOYEE    DATE *(MM/DD/YYYY)*

## SECTION I: ADDITIONAL COMMENTS/INFORMATION

USE THIS AREA FOR ANY ADDITIONAL INFORMATION

*Emply refused to sign approval*

Exhibit F

5. Why did you feel Ms. Tillman should only be rated at the "Fully Successful" level for rating year 2021 instead of the "Excellent" level? Explain in detail.

RMO response to Question 5: RMO erred in mixing conduct with performance and erroneously believed that because a usable self-assessment was not provided, the outcome could be no higher than Fully Satisfactory. The latter was a secondary reason.

6. Did Ms. Tillman advise you that she felt she was being discriminated against because of her race and/or her sex/gender and/or that she was being subjected to reprisal for engaging in prior EEO activity by being given the "Fully Successful" rating for 2021? Explain in detail.

RMO response to Question 6: No, complainant made some comments about her feelings of unfairness but did not put it in terms of discrimination.

Hostile Work Environment

1. Please explain the facility's policy on responding to allegations of a hostile work environment put forth by an employee?

RMO response to Hostile Work Environment Question 1: My understanding is that this term sometimes refers to sexual and other harassment, in which case, managers investigate and (especially in the sexual harassment sense) take prompt action to prevent ongoing harms and employee may be referred to HPP or EEO. It may also be a generic reference to discrimination, in which case the EEO office responds to allegations of a hostile work environment. Managers educate employees about reporting an EEO complaint and would not discourage reporting.

2. What is your understanding of management's role and responsibility once an allegation of harassment is put forth by an employee?

RMO response to Hostile Work Environment Question 2: While there are other forms of harassment, most VA policy I have seen refers to sexual harassment. Management's role in sexual harassment is to investigate and act quickly before more harm can occur. In addition to management action, victims may be referred to HPP or EEO.

3. Have you received training on how to deal with allegations of a Hostile work environment?

RMO response to Hostile Work Environment Question 3: I am up to date with all TMS courses on EEO, whistleblower protection, harassment prevention and others (see below). No training beyond that.

10/11/2022 Harassment Prevention & Accountability Training
10/11/2022 EEO, Diversity, Equity and Inclusion training for Managers and Supervisors

Affiant's Initials: _PW_   Date: _10/14/22_                          PAGE 11

Exhibit G

## Tillman, Inez

| | |
|---|---|
| **From:** | Tillman, Inez |
| **Sent:** | Thursday, October 13, 2022 9:46 AM |
| **To:** | zeniti@aol.com |
| **Subject:** | FW: Update |

**From:** Sands, Brian (he/him/his) <Brian.Sands2@va.gov>
**Sent:** Thursday, October 13, 2022 9:43 AM
**To:** Tillman, Inez <Inez.Tillman@va.gov>
**Cc:** Wolkin, Adam <Adam.Wolkin@va.gov>; Roe, Karen L. <Karen.Roe@va.gov>
**Subject:** Update

Hi Inez-

I had a consultation Tuesday with a representative of VISN Labor Relations. I had requested the consultation to answer a range of questions and two of their answers surprised me.

The first is about self-assessments. I had believed that performance assessments higher than fully successful required that the employee write a self-assessment that became part of the assessment package. I learned that I was mistaken; it is only a **requirement** for ECF evaluations (where it is required regardless of anticipated rating), although it is strongly encouraged for all assessments and the usual practice. Documenting that employees have gone "above and beyond" across many elements of their performance plan can be difficult without a self-assessment that the supervisor can use as a guide. Self-assessments have an important role but I was mistaken when I said that VA policy dictates that ratings above Fully Successful were impossible without one.

The second thing I learned is that VA Policy is to rate performance without reference to conduct. I now understand that the issues around interactions with the clinic coordinator and some other issues are considered conduct and I was wrong to make your response to conduct issues a contingency of what should have been a matter of performance and performance only. There are elements in the performance plan that are adjacent (sections in the Customer Service Section that address how employers relate to their supervisor and other staff) but overall, my impression in 2021 was that that your performance deserved an Excellent Rating and I should not have withheld that.

I apologize that my misunderstanding of these two questions resulted in my giving you a performance rating of Fully Successful last year when it should have been Excellent. I am unsure whether it is possible to change a 2021 performance rating at this date but if it is possible (and you remain in agreement that it should be Excellent) , I will change yours to Excellent for 2021. I wish I could tell you definitively whether change of a 2021 rating is possible at this date in 2022 but I will find out and change your rating if I am allowed to. There is nothing that you need to do. I am writing to you today because I learned of this Tuesday, confirmed the policies Wednesday and wanted to be prompt in acknowledging these errors and their impact on your rating.

-Brian

1

## DEPARTMENT OF VETERANS AFFAIRS
## OFFICE OF EMPLOYMENT DISCRIMINATION COMPLAINT ADJUDICATION
## WASHINGTON, D.C. 20420

### TRANSMITTAL OF FINAL ORDER

**TO:**     The Parties
Representatives of the Parties (if applicable)
ORMDI Field Office
EEOC Administrative Judge

**SUBJ:**     Final Order

| | |
|---|---|
| Complainant's Name: | Inez Tillman |
| Agency Case No.: | 200H-630-2022-142474 |
| EEOC Case No.: | 520-2023-00068X |

Enclosed is the Department's Final Order concerning the above-referenced complaint(s) of employment discrimination.

The Final Order includes a statement explaining the complainant's right of appeal and right to file a civil action.

The transmittal to the complainant and, if applicable, the complainant's representative, includes EEOC Form 573 (MSPB Form 185, if the subject complaint is a "mixed case") for use should the complainant wish to appeal the enclosed Final Order.

If the complainant requested a hearing before an EEOC administrative judge, the transmittal to the ORMDI field office also encloses the hearing record, including the EEOC administrative judge's decision, and/or other miscellaneous correspondence/documents provided to this office by the judge.

Enclosure(s)

**DEPARTMENT OF VETERANS AFFAIRS**
**OFFICE OF EMPLOYMENT DISCRIMINATION COMPLAINT ADJUDICATION**
**WASHINGTON, D.C. 20420**

| | |
|---|---|
| Inez Tillman, <br><br>            *Complainant,* <br><br>            *v.* <br> Secretary, <br> Department of Veterans Affairs, <br><br>            *Agency.* | VA Case No. 200H-630-2022-142474 <br><br> EEOC Case No. 520-2023-00068X |

## FINAL ORDER

It is the final action of this Department in the above-referenced matter to accept and fully implement the attached decision of the EEOC administrative judge.

If dissatisfied with this final action, the Complainant may appeal or file a civil action as set forth below.

### RIGHT OF APPEAL

Complainant may appeal this final decision or order within 30 calendar days of receipt to: **Equal Employment Opportunity Commission, Office of Federal Operations (EEOC- OFO)**. The appeal may be filed via the EEOC's Public Portal, U.S. Mail, or Hand-Delivery.

1. **EEOC-OFO recommends that all submissions and communications from complainants be electronic.**

   a. **Appeals submitted electronically should be completed via the EEOC Public Portal at** https://publicportal.eeoc.gov/Portal/Login.aspx. See warning below and detailed instructions attached.

### WARNING!

Attorneys and non-legal representatives MUST <u>NOT</u> use the EEOC Public Portal to file appeals on behalf of their clients as the portal will incorrectly list the representative as the complainant. Therefore, COMPLAINANTS MUST file electronic appeals themselves through the EEOC Public Portal regardless of whether they are represented.

1

b.  **Appeals submitted by mail should be completed by using EEOC Form 573.** A copy of EEOC Form 573 is attached.  Appeals submitted by mail should be sent to:

> Director
> U.S. Equal Employment Opportunity Commission
> Office of Federal Operations
> P.O. Box 77960
> Washington, D.C. 20013

c.  **As an alternative to mailing the appeal, the appeal may be hand-delivered to:**

> Equal Employment Opportunity Commission
> Office of Federal Operations
> 131 M Street N.E., Suite 5SW12G
> Washington, D.C. 20507-0004

2. **If mailing or hand-delivering the appeal to the EEOC-OFO, a copy of the appeal must also be sent to the VA Office of General Counsel at the following address:**

> Department of Veterans Affairs
> Office of the General Counsel (024)
> 810 Vermont Ave., N.W.
> Washington, DC 20420

3. Statements or briefs in support of the appeal must be submitted to the EEOC-OFO within 30 calendar days of the filing of the appeal.  The EEOC-OFO will accept statements or briefs in support of an appeal by facsimile transmittal at (202) 663-7022. If statements or briefs are submitted by mail or hand delivery, a copy of any such statement or brief, including any statements made on EEOC's "Appellant Docketing Statement," must also be sent to the VA's Office of General Counsel at the above address.

4. If an appeal is filed with the EEOC-OFO by mail or hand delivery, the appeal, and any subsequently filed statement or brief, must contain a statement certifying the date and method by which copies of these documents were served on the VA's Office of General Counsel.

5. If Complainant files an appeal with the EEOC-OFO beyond the above-noted time limit, Complainant should provide the EEOC-OFO with an explanation as to why the appeal should be accepted despite its untimeliness.  If Complainant cannot explain why timeliness should be excused, the EEOC-OFO may dismiss the appeal as untimely.

2

## RIGHT TO FILE A CIVIL ACTION

Complainant also has the right to file a civil action in an appropriate United States District Court. Complainant may file a civil action as follows:

(1) within 90 days of receipt of this final decision if no appeal to the EEOC-OFO has been filed; OR

(2) within 90 days after receipt of the EEOC-OFO's final decision on appeal; OR

(3) after 180 days from the date of filing an appeal with the EEOC-OFO if there has been no final decision by the Commission.

Complainant must name the official head of the Department of Veterans Affairs, **Denis McDonough,** as the Defendant. Complainant may not name just the Department. Complainant must also state the official title of the Department head, which is the **Secretary of Veterans Affairs.** Failure to provide the name or official title of the head of the Department may result in dismissal of the case. **Please consult your District Court's website for procedures to file a civil action and any COVID-19-related changes in procedures.**

If Complainant decides to file a civil action under Title VII (discrimination due to race, color, religion, sex, national origin, or reprisal) or under the Rehabilitation Act of 1973, as amended, (discrimination due to disability), and if Complainant does not have or cannot afford the services of an attorney, Complainant may request that the Court appoint an attorney to represent Complainant and that the Court permit Complainant to file the action without payment of fees, costs, or other security. **The grant or denial of the request is within the sole discretion of the Court.** Filing a request for an attorney does not extend the time in which to file a civil action. Both the request and the civil action MUST BE FILED WITHIN NINETY (90) CALENDAR DAYS of the date Complainant receives the final decision from the Department or the Commission.

**MARY LYNNE POPIDEN**
Digitally signed by MARY LYNNE POPIDEN
Date: 2023.09.20 09:54:41 -04'00'

_____
MARY LYNNE POPIDEN
Director,
Office of Employment Discrimination
Complaint Adjudication

9/20/2023
_____
Date

Enclosures:  EEOC Public Portal Instructions
             EEOC Form 573

# DEPARTMENT OF VETERANS AFFAIRS
## OFFICE OF EMPLOYMENT DISCRIMINATION COMPLAINT ADJUDICATION
### WASHINGTON, D.C. 20420

## CERTIFICATION OF SERVICE

Complainant's Name:     Inez Tillman
Agency Case No.:        200H-630-2022-142474
EEOC Case No.:          520-2023-00068X

I certify that on this date, the foregoing Final Order was sent via electronic mail to the individuals and parties shown below. For timeliness purposes, it shall be presumed that the parties received the foregoing Final Order within five (5) calendar days after the date it was sent via electronic mail.

Complainant

Inez Tillman

zeniti@aol.com

Complainant's Representatives

Michael C. Fallings

mfallings@fedattorney.com

Nora Ezzat Cozzillio

ncozzillio@fedattorney.com

Agency's Representative

Shani Walker

Shani.Walker1@va.gov

Administrative Judge

Neile F. Eisner

neile.eisner@eeoc.gov

**EEO Manager**

Marcia Gordon

marcia.gordon@va.gov

**ORMDI Regional Office (08E)**

ORMNEOAdministrativeGroup@va.gov

MARCELLA CALLENDER
Digitally signed by
MARCELLA CALLENDER
Date: 2023.09.20
09:59:03 -04'00'

9/20/2023

_____
(Signature of Dispatcher)

_____
(Date of Dispatch)

PRESS FIRMLY TO SEAL

PRESS FIRMLY TO SEAL

PRIORITY MAIL
FLAT RATE ENVELOPE
POSTAGE REQUIRED

**UNITED STATES POSTAL SERVICE®** | **PRIORITY MAIL**

■ Expected delivery date specified for domestic use.
■ Most domestic shipments include up to $50 of insurance (restrictions apply).*
■ USPS Tracking® included for domestic and many international destinations.
■ Limited international insurance.**
■ When used internationally, a customs declaration form is required.

*Insurance does not cover certain items. For details regarding claims exclusions see the Domestic Mail Manual at http://pe.usps.com.

** See International Mail Manual at http://pe.usps.com for availability and limitations of coverage.

# FLAT RATE ENVELOPE
ONE RATE ■ ANY WEIGHT

# TRACKED ■ INSURED

EP14F May 2020
OD: 12 1/2 x 9 1/2

PS00001000014

USPS SDNY

---



**UNITED STATES POSTAL SERVICE®** | **Click-N-Ship®**

9405 5036 9930 0628 8317 57 0096 5000 0041 0007

usps.com
$9.65
US POSTAGE
Flat Rate Env

**U.S. POSTAGE PAID**
Click-N-Ship®

11/25/2023          Mailed from 48042     9867442600579995

## PRIORITY MAIL®

Expected Delivery Date: 11/28/23

0003

C099

INEZ TILLMAN
24608 CANOE DR
MACOMB MI 48042-4543



PRO SE INTAKE UNIT
500 PEARL ST
NEW YORK NY 10007-1316

USPS TRACKING #

9405 5036 9930 0628 8317 57

RECEIVED
NOV 28 2023
PRO SE OFFICE

To schedule free Package Pickup,
scan the QR code.



USPS.COM/PICKUP